UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


STEPHEN HAROLD CLINE,

                    Petitioner,

v.                                          CASE NO. 11-CV-12262
                                            HONORABLE MARIANNE O. BATTANI
DEBRA L. SCUTT,

                    Respondent.
_____/

**OPINION AND ORDER
DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS,
GRANTING IN PART A CERTIFICATE OF APPEALABILITY,
AND GRANTING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

        Petitioner Stephen Harold Cline has filed a pro se petition for the writ of habeas

corpus under 28 U.S.C. § 2254.  The habeas petition challenges Petitioner's Huron

County convictions for kidnapping and vulnerable adult abuse.  He claims that (1) his

trial attorney should have moved for a change of venue, (2) there was insufficient

evidence to support his convictions for vulnerable adult abuse, (3) he is entitled to re-

sentencing because the trial court departed from the sentencing guidelines partly

because of his alleged future dangerousness, (4) the prosecutor deprived him of

counsel of choice by concealing and withholding a social security disability check, (5) a

police officer testified falsely or falsified a police incident report, and (6) he has

demonstrated "cause and prejudice" for not raising claims four and five on direct

appeal.  Respondent Debra L. Scutt urges the Court through counsel to deny the

petition for lack of merit.  The Court has determined from a review of the record that the

state court decisions on Petitioner's claims were objectively reasonable.  Therefore, the

habeas petition must be denied.  A procedural history and analysis of Petitioner's

claims follow.

## I.  BACKGROUND

Petitioner was charged in Huron County, Michigan with one count of kidnapping,

Mich. Comp. Laws § 750.349, and seventeen counts of first-degree vulnerable adult

abuse, Mich. Comp. Laws § 750.145n(1).  The complainant was Petitioner's wife,

> who is completely blind and is a brittle, type I diabetic.[1]  [The complainant]
> and [Petitioner] first met in January 2001 at the Commission for the Blind
> training school in Kalamazoo, Michigan.[2]  They started a romantic
> relationship at the end of January 2001, and they married on September
> 21, 2002.
>
> After being hospitalized in April 2005, [the complainant] had trouble
> speaking. She wondered if she had been deprived of oxygen or had
> suffered a stroke. Shortly thereafter, while cleaning her and [Petitioner's]
> apartment, [the complainant] discovered ropes and a digital camera,
> which, after asking a friend to examine it, she learned contained photos of
> her hogtied, nude, and lying face down.[3]  [The complainant] also
> discovered three videotapes, one of which depicted several incidences of
> her being tied up or bound, either naked or scantily clad, with a bag over
> her head, struggling to breathe.  [Petitioner] appeared in some of the
> scenes.  [The complainant] did not recall making the videotape, and she
> did not consent to it.  During a police interview, [Petitioner] stated that,
> except for one occasion, these activities were consensual and that he was

---

[1]  Type I diabetes mellitus is an insulin-dependent form of the disease.
Stedman's Medical Dictionary (26th ed., 1995), p. 473.  Brittle diabetes mellitus is
characterized by "marked fluctuations in blood glucose concentrations that are difficult
to control."  Id. at 472.

[2]  Defendant is legally blind because he has problems with peripheral and night
vision, but he can still read and drive a car.

[3]  [The complainant] also discovered other items in the apartment:  a duffel bag
that contained plastic bags, rubber bands, and a sex toy; more ropes; a roll of plastic
wrap; and crates with short skirts, corsets, and nylons.

sexually aroused by them.

People v. Cline, 276 Mich. App. 634, 636; 741 N.W.2d 563, 565 (2007) (footnotes in original) (alterations added).

There was additional evidence that Petitioner and the complainant talked on the telephone after Petitioner's arrest.  During that conversation, the complainant asked Petitioner why he did the things he did to her.  Petitioner then admitted that what he did was wrong, that he had an illness, and that he had done some things out of anger toward the complainant.  He wanted her to drop the charges against him.

Convicted felon Michael Ward testified that he was confined in Huron County Jail facing charges of accosting a child for immoral purposes, indecent exposure, furnishing alcohol to a minor, and malicious destruction of a building.  In return for his truthful testimony against Petitioner, he was hoping that the prosecution would consider a reduction in these charges.

Ward testified that he became acquainted with Petitioner while the two of them were incarcerated at the Huron County Jail.  Petitioner told him that, when he was with his wife, he was her primary caregiver and that he liked kinky sex.  Petitioner explained that, at times, he would overdose his wife on insulin to incapacitate her and render her vulnerable.  Sometimes, when she was in that condition, he would tie her up, put a bag over her head to suffocate her, and have sex with her.  Prior to April 11, 2005, he experimented to determine how much insulin he could use to overdose her without causing brain damage.  On April 11, 2005, he gave her too much insulin and she had a big reaction, which may have caused her to slur her speech.

The prosecutor's theory was that Petitioner was the complainant's caregiver and

3

that, between September 21, 2002, and April 14, 2005, he committed the crime of kidnapping by secretly and forcibly confining the complainant. The prosecutor maintained that Petitioner committed the crime of first-degree vulnerable adult abuse by causing serious physical harm to his wife and by abusing her for his own sexual satisfaction.

Petitioner did not testify or present any witnesses. His defense was that the prosecutor did not prove the elements of the charged crimes by showing that he secretly confined the complainant, that she was a vulnerable adult, and that he was her caregiver.

On December 22, 2005, a Huron County Circuit Court jury found Petitioner guilty, as charged, of one count of kidnapping and seventeen counts of first-degree vulnerable adult abuse. On February 13, 2006, the trial court sentenced Petitioner to concurrent terms of twenty-five to forty years in prison for the kidnapping and ten to fifteen years for each count of vulnerable adult abuse.

In an appeal of right, Petitioner argued that (1) his trial attorney was ineffective for failing to move for a change of venue, (2) the evidence was legally insufficient to support his convictions for vulnerable adult abuse, and (3) the trial court violated his right to due process by departing from the sentencing guidelines on the basis of alleged future dangerousness. The Michigan Court of Appeals found no merit in these claims and affirmed Petitioner's convictions in a published decision. See Cline, 276 Mich. App. at 634; 741 N.W.2d at 563. Petitioner raised the same claims in the Michigan Supreme Court, which denied leave to appeal on March 24, 2008, because it was not persuaded to review the issues. See People v. Cline, 480 Mich. 1134; 745 N.W.2d 786 (2008)

4

(table).

On or about March 25, 2009, Petitioner filed a motion for relief from judgment in which he claimed that (1) he had newly discovered evidence that the prosecutor illegally seized and concealed his Social Security benefits, (2) Police Officer Colleen Emerick either testified falsely or falsified a police incident report, and (3) his trial and appellate attorneys were constitutionally ineffective for failing to raise his claims about the prosecutor and Officer Emerick at trial and on appeal.  The trial court found no merit in these claims and denied Petitioner's motion.  Petitioner appealed the trial court's decision, but the Michigan Court of Appeals denied leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D).  See People v. Cline, No. 297904 (Mich. Ct. App. July 9, 2010).  On March 29, 2011, the Michigan Supreme Court denied leave to appeal for the same reason.  See People v. Cline, 489 Mich. 859; 795 N.W.2d 141 (2011) (table).

Petitioner signed and dated his habeas corpus petition on May 10, 2011.  The grounds for relief are the six claims that Petitioner raised on direct appeal and in his motion for relief from judgment.

## II.  STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  Harrington v. Richter, __ U.S. __, __, 131 S. Ct. 770, 783 (2011).  Pursuant to § 2254, the court may not grant a state prisoner's application for the writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the merits

5

(1)     resulted in a decision that was contrary to, or involved an
        unreasonable application of, clearly established Federal law,
        as determined by the Supreme Court of the United States;
        or

(2)     resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented
        in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court
> may grant the writ if the state court arrives at a conclusion opposite to that
> reached by [the Supreme] Court on a question of law or if the state court
> decides a case differently than [the Supreme] Court has on a set of
> materially indistinguishable facts.  Under the "unreasonable application"
> clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the
> state court identifies the correct governing legal principle from [the
> Supreme] Court's decisions but unreasonably applies that principle to the
> facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for

Part II).

 "[A] federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly.  Rather, that application must

also be unreasonable."  Id. at 411.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court

rulings,' Lindh v. Murphy, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court

decisions be given the benefit of the doubt,' Woodford v. Visciotti, 537 U.S. 19, 24

(2002) (per curiam)."  Renico v. Lett, 559  U.S. 766, 773 (2010).  "A state court's

determination that a claim lacks merit precludes federal habeas relief so long as

'fairminded jurists could disagree' on the correctness of the state court's decision."

6

Harrington v. Richter, 131 S. Ct. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  Id.  (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)).  To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. at 786-87.

### III.  DISCUSSION

**A.  Trial Counsel**

Petitioner alleges that his trial attorney was ineffective for failing to move for a change of venue due to inflammatory pre-trial publicity that saturated the community and tainted the jury pool.  The pretrial publicity apparently included three articles about Petitioner's case in the Bay City Times and eight articles about his case in the Huron Daily Tribune.  According to Petitioner, twenty of fifty-six prospective jurors (thirty-six percent) were excused for cause after they admitted to being exposed to pretrial publicity and forming an opinion of Petitioner's guilt.  And eight of the twelve jurors who deliberated his case (sixty-seven percent) had heard about the case before trial.  In light of these statistics, Petitioner asserts that his trial attorney should have sought a change of venue and, if he had, the trial court would have been required to grant the motion.

The Michigan Court of Appeals stated on direct review of this issue that the totality of the circumstances surrounding the jury selection did not overcome the seated jurors' assurances that they could decide the case impartially.  The Court of Appeals

7

concluded that the trial court would not have erred in denying a motion to change venue and that trial counsel did not deprive Petitioner of his right to a fair trial by failing to move for a change of venue.

## 1. Clearly Established Federal Law

### a. Ineffective Assistance

The Sixth Amendment to the United States Constitution "does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ." Burt v. Titlow, __ U.S. __, __, 134 S. Ct. 10, 18 (2013). To prevail on his claim, petitioner must show that his attorney's performance was deficient and that the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Id.

An attorney's performance is deficient if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. "Judicial scrutiny of counsel's performance must be highly deferential." Id. at 689.

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See Michel v. Louisiana, [350 U.S. 91, 101 (1955)]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

Id.

To demonstrate that an attorney's deficient performance prejudiced the defense, the defendant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. The petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' " but "[t]he likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 131 S. Ct. at 792 (quoting Strickland, 466 U.S. at 693).

### b. Pretrial Publicity

At issue here is trial counsel's failure to move for a change of venue due to pretrial publicity.

> It is well established that if prejudicial pretrial publicity jeopardizes a defendant's right to a fair trial by an impartial jury, the court should grant the defendant a change in venue. See Irvin v. Dowd, 366 U.S. 717, 722–24, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Foley v. Parker, 488 F.3d 377, 387 (6th Cir. 2007). Prejudice can be presumptive or actual. Foley, 488 F.3d at 387. "Presumptive prejudice from pretrial publicity occurs where an inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community" and "is rarely presumed." Id. In the absence of presumed prejudice, "the trial court has a responsibility to confront the fact of the publicity and determine if the publicity rises to the level of 'actual prejudice.' " Ritchie v. Rogers, 313 F.3d 948, 962 (6th Cir. 2002). "[A] searching voir dire of the prospective jurors is the primary tool to determine if the impact of the publicity rises to th[e] level" of actual prejudice. Id. At voir dire, the court must examine the jurors' statements to determine if there is a community-wide sentiment against the defendant; however, "[n]egative media coverage by itself is insufficient to establish actual prejudice." Foley, 488 F.3d at 387. When evaluating jurors, "mere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the

merits, does not in and of itself raise a presumption of jury taint . . . ."
DeLisle v. Rivers, 161 F.3d 370, 382 (6th Cir.1998).  Rather, "[t]he
relevant question is 'did [the] juror swear that he could set aside any
opinion he might hold and decide the case on the evidence, and should
the juror's protestation of impartiality have been believed.' "  Foley, 488
F.3d at 387 (second alteration in original) (quoting Patton v. Yount, 467
U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)).  If a biased
juror was seated who should have been dismissed for cause, we must
reverse the conviction.  Hughes v. United States, 258 F.3d 453, 463 (6th
Cir. 2001).

Campbell v. Bradshaw, 674 F.3d 578, 593-94 (6th Cir.), cert denied, __ U.S. __, 133 S.

Ct. 527 (2012).

###    2.  Application

According to the Michigan Court of Appeals, there were eleven articles about

Petitioner's case in local newspapers:

> Six of the articles discuss the facts of the case, including the prosecutors'
> perceptions of the facts and evidence, and track the procedural status of
> the case.  The other five address the proposal and passage of anti-torture
> legislation, noting that the legislation was prompted by [Petitioner's] case.
>
> . . . While the six articles dealing with the case itself discuss more than
> just its status, they do not 'reveal the kind of inflammatory community
> atmosphere that might sometimes justify disregarding the jurors' claims of
> impartiality.'  Only one article is an opinion piece, and that article is
> specifically focused on the introduction and passage of the anti-torture
> legislation.

Cline, 276 Mich. App. at 639-40; 741 N.W.2d at 567 (internal citations omitted).

The transcript of the voir dire proceedings indicate that the case was also

mentioned on radio and television.  Many of the prospective jurors had heard

something about the case.  Petitioner, however, has failed to establish sufficient facts to

demonstrate presumptive prejudice from the pretrial publicity, as there is no indication

in this case that an inflammatory, circus-like atmosphere pervaded the community.

10

Petitioner also has failed to show that he suffered actual prejudice. The trial court questioned each of the prospective jurors who had heard about the case. The questioning occurred in chambers, one prospective juror at a time. After excusing ten prospective jurors for cause, the trial court said, "We're getting close to start to thinking about a change of venue if this keeps ups, if it gets worse." (Trial Tr. Vol. I, 94, Dec. 13, 2005.) Although defense counsel did not request a change of venue, he did indicate that it was necessary to continue with the tedious process of interviewing each prospective juror who had heard about the case. (Id. at 126.)

Voir dire continued with the court questioning each prospective juror who had heard or read about the case. The trial court excused those jurors who had formed an opinion about Petitioner's guilt or innocence or who had expressed an inability to set aside what they had learned about the case and make a decision based only on the evidence.

Of the twelve jurors who deliberated Petitioner's case, four of them had not heard anything about the case. The Court believes that the eight jurors who did hear or read something about the case were Roger Gothro (juror number 84), Ronald Tyll (juror number 131), Gary Ricker (juror number 96), Thomas Kempisty (juror number 87), Kristine Gettel (juror number 99), Paulette Mauer (juror number 119), Steven Kosma (juror number 67), and Michael Zinger (juror number 123).

Roger Gothro heard about the case on the radio, but he did not read any newspaper articles or see any television reports about the case. Although he did hear what Petitioner was alleged to have done, he did not recall all the details, and he assured the trial judge that he had not formed an opinion of Petitioner's guilt or

11

innocence as a result of what he had heard.  He understood the presumption of
innocence and thought that he could decide the case only on the evidence presented
during the trial.  When defense counsel asked Mr. Gothro whether he believed that
Petitioner was guilty, Gothro responded, "Well, no, I don't know any other details."  (Id.
at 191-95.)

Ronald Tyll also heard about the case on the radio.  He heard about the case
almost every day for the previous week, but he did not form an opinion on Petitioner's
guilt or innocence, and he stated that he could decide the case based on the evidence
at trial.  He knew of no reason why he could not render a fair and impartial verdict.  (Id.
at 178-80.)

Gary Ricker read about the case in The Daily Tribune about four or five months
before trial, but nothing he read caused him to form an opinion.  He did not hear about
the case on the radio or on television, and he did not have an opinion as to whether
Petitioner was guilty.  He assured the trial court that he could decide the case with an
open mind, based only on the evidence presented in the courtroom, and he knew of no
reason why he could not sit on the jury and render a fair and impartial verdict.  (Id. at
120-26.)

Michael Zinger also knew of no reason why he could not render a fair and
impartial verdict based solely on the evidence presented in the courtroom.  (Id. at 126.)
He read about the case in the Tribune two or three times, and he also heard about the
case on the radio, on television, and in the community.  Through those sources, he
learned the basic facts of the case and that some legislation had been proposed.  He
believed that he could decide the case based on the evidence at trial, as he had not

12

formed an opinion on Petitioner's guilt or innocence.   (Id. at 90-93.)

Thomas Kempisty overheard people talking about the case at his job.  He did not

form an opinion about the case or about Petitioner's guilt or innocence, and he stated

that he was able to decide the case based on the evidence alone.  (Id. at 214-16.)

Kristine Gettel saw some news about the case on the night before trial.  That

was her first and only exposure to the case.  She knew of no reason why she could not

sit on the jury and render a fair and impartial verdict based solely on the evidence

presented in the courtroom.  (Id. at 212-13.)

Paulette Mauer read two articles about the case in the Tribune, and she knew

something about the case from television.  She knew what Petitioner allegedly did, but

she did not form any opinions as to his guilt or innocence as a result of what she heard.

Initially, she said that she did not agree with what Petitioner did, but then she

acknowledged that there really was no way of knowing whether Petitioner did anything

because no evidence had been presented to her yet.  She did not think that anything

had been written or said in the media to cause her to form an opinion about the case,

and she knew of no reason why she could not serve as a fair and impartial juror.  (Id. at

243-49.)

Steven Kosma read "bits and pieces" about the case in the newspaper a few

months earlier.  He did not recall specific facts about the case, and he did form any

opinion as to Petitioner's guilt or innocence.  He stated that he would be able to listen to

the evidence and decide the case solely on the evidence, and he knew of no reason

why he could not sit on the jury and render a fair and impartial verdict based solely on

the evidence presented in the courtroom.  (Id. at 161-64.)

13

Petitioner has not identified a single juror who deliberated his case and indicated an inability to fairly try the case or to set aside his or her prior knowledge about the case.  Nor has he alleged any reason why the jurors' claimed impartiality should not be believed.  And because he has not shown presumptive or actual prejudice based on pretrial publicity, his attorney was not ineffective for failing to move for a change in venue.  The state court therefore did not unreasonably apply Strickland when it concluded that Petitioner was not deprived of a fair trial by defense counsel's failure to move for change of venue.  Petitioner has no right to relief on the basis of his ineffective-assistance-of-counsel claim.

**B.  Sufficiency of the Evidence**

Petitioner alleges next that there was legally insufficient evidence to support his convictions for vulnerable adult abuse.  Specifically, he contends that the complainant was not a vulnerable adult as defined by state law.  The Michigan Court of Appeals disagreed and concluded that there was sufficient evidence adduced at trial to establish that the complainant was a vulnerable adult under state law.

**1.  Clearly Established Federal Law**

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  "After Winship the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction" is

> whether the record evidence could reasonably support a finding of guilt
> beyond a reasonable doubt.  But this inquiry does not require a court to

14

"ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (internal citation and footnote omitted) (emphases in original).

"A sufficiency of the evidence claim is a 'steep climb' . . . ." United States v. Ross, 703 F.3d 856, 882 (6th Cir. 2012) (quoting United States v. Stafford, 639 F.3d 270, 273 (6th Cir. 2011)). Federal courts, moreover,

apply two layers of deference in reviewing habeas claims challenging evidentiary sufficiency. McGuire v. Ohio, 619 F.3d 623, 631 (6th Cir. 2010) (citing Brown v. Konteh, 567 F.3d 191, 204–05 (6th Cir. 2009)). "First . . . [they] must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Brown, 567 F.3d at 205 (citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L. Ed. 2d 560 (1979)). "Second, even were [they] to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, [they] must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." Id. (citing 28 U.S.C. § 2254(d)(2)).

Moreland v. Bradshaw, 699 F.3d 908, 916-17 (6th Cir. 2012), cert denied, __ U.S. __, 134 S. Ct. 110 (2013).

**2. Application**

The Jackson standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16. In Michigan, "[f]irst-degree vulnerable-adult abuse occurs when 'the caregiver intentionally causes serious physical harm or serious mental harm to a vulnerable adult.'" People v. Comella, 296 Mich. App. 643, 649-50; 823 N.W.2d 138, 141 (2012)

15

(quoting Mich. Comp. Laws § 750.145n(1)), appeal denied, 493 Mich. 905; 823 N.W.2d 278 (2012).

The only element in dispute here is whether the complainant was a vulnerable adult. Under Mich. Comp. Laws § 750.145m(u)(i), a vulnerable adult can mean "[a]n individual age 18 or over who because of age, developmental disability, mental illness, or physical disability requires supervision or personal case or lacks the personal and social skills required to live independently." "Personal care" is defined in Mich. Comp. Laws § 750.145m(m) as "assistance with eating, dressing, personal hygiene, grooming, or maintenance of a medication schedule as directed and supervised by a vulnerable adult's physician."

Petitioner points out that, although the complainant was blind and diabetic, she lived independently for a while after they met and worked as a reservation agent for Northwest Airlines. She occasionally traveled by airplane to the Upper Peninsula to visit him, and she was able to bathe, feed, and clothe herself, give herself insulin injections, walk, climb stairs, and do household chores by herself. He concludes that, under these circumstances, the prosecutor failed to prove beyond a reasonable doubt that the complainant required supervision, personal care, or the skills required to live independently.

The record supports Petitioner's version of the facts to an extent. The complainant testified that, during a two-year period of time, she lived independently and was responsible for herself. She was able to work and perform her job so well that she received a merit award from her employer. (Trial Tr. Vol. II, 408-09, 432.) And, at the time of trial, she could bathe, feed, and clothe herself. She could also wash her

16

clothes, although the dark clothing would get mixed in with the light-colored clothing. Additionally, she could go to the bathroom without assistance, shower and clean up by herself, and live independently to some degree.  (Id. at 428-29.)

Despite these indicators of self sufficiency, the complainant required some assistance.  (Id. at 427-28.)  Due to her total blindness, she depended on others for transportation, help with purchasing food, selecting the right canned goods in her own cupboards, getting refills on prescriptions, and reading her mail.  (Id. at 303-04.)  She also had trouble paying her bills without assistance.  (Id. at 431.)

The Michigan Court of Appeals determined that there was sufficient evidence adduced at trial to establish that the complainant was a vulnerable adult under the statute.  The record supports this conclusion, for the complainant was over eighteen years of age and, due to her blindness, she required supervision and some degree of personal care.  Thus, a rational trier of fact viewing the evidence in the light most favorable to the prosecution could have concluded that the complainant was a vulnerable adult.

Even if the Court had concluded that a rational trier of fact could not have found Petitioner guilty beyond a reasonable doubt, the state appellate court's sufficiency determination was not unreasonable.  This Court therefore must defer to the state court's conclusion that the complainant was a vulnerable adult under state law and that there was sufficient evidence to support the jury's verdict.  Moreland v. Bradshaw, 699 F.3d at 917.  In fact, the state court's interpretation of state law binds this Court sitting in habeas corpus.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (citing Estelle v. McGuire, 502 U.S. 62, 67–68 (1991), and Mullaney v. Wilbur, 421 U.S. 684, 691 (1975)).  The

17

Court therefore declines to grant relief on the basis of Petitioner's challenge to the sufficiency of the evidence.

## C.  The Sentence

Petitioner alleges that he is entitled to be re-sentenced because the trial court departed from the statutory sentencing guideline range, in part, on the basis of his alleged future dangerousness.[4]  Petitioner contends that his alleged future dangerousness was not an objectively verifiable reason for departing from the guidelines.

The Michigan Court of Appeals determined on direct review that Petitioner was not entitled to re-sentencing.  The court stated that the trial court did not rely on Petitioner's age and future dangerousness in departing from the guidelines.  The court opined in the alternative that the trial court would have departed to the same extent without consideration of the invalid factors.

In Michigan, a sentencing court may depart from the state sentencing guidelines if the court has a substantial and compelling reason for the departure.  Mich. Comp. Laws § 769.34(3).  A factor must be objective and verifiable if used as a substantial and compelling reason for departing from the guidelines.  See People v. Babcock, 469 Mich. 247, 264-65; 666 N.W.2d 231, 241 (1995).  Nevertheless, "Petitioner had no federal constitutional right to be sentenced within Michigan's guideline minimum sentence recommendations."  Doyle v. Scutt, 347 F. Supp.2d 474, 485 (E.D. Mich. 2004).  And

---

[4]  The highest minimum sentence scored under the sentencing guidelines was eighteen years, nine months.  Petitioner received a minimum sentence of twenty-five years for his kidnapping conviction.

the contention that the state court violated Michigan law fails to state a claim for which habeas corpus relief may be granted.  Austin v. Jackson, 213 F.3d 298, 300 (6th Cir. 2000).

Furthermore, Petitioner's sentence of twenty-five to forty years in prison for kidnapping and ten to fifteen years in prison for vulnerable adult abuse did not exceed the statutory limits.  See Mich. Comp. Laws § 750.349(3) (kidnapping is punishable by imprisonment for life or any term of years); Mich. Comp. Laws § 750.145n(1) ("Vulnerable adult abuse in the first degree is a felony punishable by imprisonment for not more than 15 years . . . .")  "As long as the sentence remains within the statutory limits, trial courts have historically been given wide discretion in determining 'the type and extent of punishment for convicted defendants.' "  Austin, 213 F.3d at 301 (quoting Williams v. New York, 337 U.S. 241, 245 (1949)).

Finally, even if Petitioner's claim were cognizable on habeas review, there is no merit in the claim. Petitioner was forty-three years old at sentencing, and the trial court opined that, for the safety of the public and society, Petitioner had to be kept away from society for a long time or at least until he could be safely returned to society.

Future dangerousness may not be a verifiable and proper consideration under state law, but the trial court relied on several other permissible factors as grounds for exceeding the sentencing guidelines.  Among the factors the court considered were: Petitioner's outrageous conduct; the fact that he took advantage of a physically limited victim for his own sadistic purposes; the fact that Petitioner's total offense variable score was 120 even though the highest level on the grid for the offense variable score was 100+; and the fact that Petitioner was convicted of seventeen convictions for

19

vulnerable adult abuse.

The record supports the state appellate court's conclusion that the trial court would have departed from the sentencing guidelines range to the same extent even if it had ignored Petitioner's age and future dangerousness. And, for all the foregoing reasons, the Court declines to grant relief on Petitioner's sentencing claim.

## D. The Prosecutor

Petitioner claims to have newly discovered evidence that the prosecutor seized and concealed funds to which he was entitled as a recipient of social security disability benefits. He maintains that the seizure of the funds deprived him of his right to hire his own attorney instead of having to rely on a public defender.

The trial court was the only state court to address this issue. It stated that Petitioner's factual assertions did not support the conclusion that the prosecutor's retention of a check for $740 constituted an unreasonable and arbitrary interference with Petitioner's right to counsel of his own choice.

### 1. Clearly Established Federal Law

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a defendant in a criminal case the right to the assistance of counsel in his or her defense. Faretta v. California, 422 U.S. 806, 807 (1975). "[A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006). Put another way, " 'the Sixth Amendment 'guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire,

20

or who is willing to represent the defendant even though he is without funds.' " Id.

(quoting Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624-25 (1980)).

"A choice-of-counsel violation occurs whenever the defendant's choice is wrongfully

denied." Id. at 150 (emphasis in original). The petitioner "need not show prejudice or

demonstrate that the counsel he received was ineffective." Abbey v. Howe, __ F.3d __,

__, No. 12-1437, 2014 WL 321866, at *5 (6th Cir. Jan. 30, 2014).

### 2. Application

Although Petitioner alleges that he should have received $5,250 in social

security disability benefits before he was convicted and that $4,510 of that amount is

still missing, exhibits to the habeas petition indicate that the prosecutor withheld only

$740. The prosecutor received a cashier's check for $740 from the complainant with a

note stating that the funds represented social security benefits to which Petitioner was

entitled. The bank check was made payable to Petitioner, and the complainant was the

remitter on the check. At the time, Petitioner was under investigation by law

enforcement officials in Livonia, Michigan and the Upper Peninsula for criminal activity

involving the theft of thousands of dollars. The prosecutor held the cashier's check for

$740 as possible evidence until the conclusion of Petitioner's criminal case and then

deposited the money in Petitioner's jail account. See Pet. for Writ of Habeas Corpus,

Exs. 1-3.

Petitioner contends that the prosecutor's actions robbed him of the opportunity to

hire his own attorney, but the Court has found no indication in the state court record

that Petitioner wanted to retain an attorney, that he would have tried to retain an

attorney if he had received the check for $740, or that he could have retained an

attorney for a four-day felony trial with his social security benefits.  He has failed to show that the prosecutor infringed on his right to counsel of choice, and the state court's conclusion – that the prosecutor's action did not constitute an unreasonable and arbitrary interference with Petitioner's right to counsel of his own choice – was not objectively unreasonable.  Petitioner therefore has no right to relief on the basis of his fourth claim.

### E.  Officer Emerick

The fifth habeas claim alleges that Police Officer Colleen Emerick either testified falsely at trial or falsified an incident report about her investigation.  Officer Emerick's incident report indicates that, during her investigation of the case, she went to the hospital where the complainant had been admitted and talked to a nurse named Scott.  Scott advised her that the complainant had come to the hospital for treatment, but there was nothing suspicious to report.  The report indicates that Officer Emerick left the hospital after speaking to Scott.  See Pet. for Writ of Habeas Corpus, Ex. 6.

At trial, Officer Emerick testified that the information she gleaned from Scott Thies led her to another nurse, who wished to keep her name confidential.  The information that Officer Emerick acquired from the female nurse caused her to focus her attention on the complainant's situation.  (Trial Tr. Vol. III, 482-83, Dec. 21, 2005.)

Petitioner claims that Officer Emerick's report was so inconsistent with her trial testimony that either the report or the testimony must be false.  In other words, if Officer Emerick's report is accurate about whom she consulted, her trial testimony was false, and if her testimony was true, she falsified her report.  Petitioner maintains that the trial testimony amounted to perjury and that the prosecutor failed to correct it.  Petitioner

22

further alleges that his trial attorney was ineffective for failing to impeach Officer

Emerick on this issue and his appellate attorney was ineffective for failing to raise this

issue on appeal.

The state trial court addressed this claim in its order denying Petitioner's motion

for relief from judgment.  It stated that

> the record supports the conclusion that defense counsel was cognizant of
> the conflict between the police officer's testimony and her police report.
> Therefore, his decision not to pursue cross-examination into that issue
> can only be ascribed to trial strategy.  Considering the overwhelming
> evidence against defendant presented at trial, including [a] video tape of
> defendant committing the offenses, defendant's claim of entitlement to
> relief is without merit.

People v. Cline, No. 05-4450-FC (Huron County Cir. Ct. May 5, 2009).

The federal definition of perjury is "false testimony [under oath or affirmation]

concerning a material matter with the willful intent to provide false testimony, rather than

as a result of confusion, mistake, or faulty memory."  United States v. Dunnigan, 507

U.S. 87, 94 (1993).  And in Michigan, a person is guilty of perjury if he or she willfully

swears falsely under oath.  Mich. Comp. Law § 750.423.

"[A] conviction obtained by the knowing use of perjured testimony is

fundamentally unfair, and must be set aside if there is any reasonable likelihood that

the false testimony could have affected the judgment of the jury."  United States v.

Agurs, 427 U.S. 97, 103 (1976) (footnote omitted).  Prosecutors may not deceive a

court and jurors by eliciting false evidence or by allowing false testimony to go

uncorrected when it appears.  Giglio v. United States, 405 U.S. 150, 153 (1972); Napue

v. Illinois, 360 U.S. 264, 269 (1959).  But to establish a denial of due process through

the use of false testimony, Petitioner must show that " '(1) the statement was actually

23

false; (2) the statement was material; and (3) the prosecution knew it was false.' " Coe v. Bell, 161 F.3d 320, 343 (6th Cir. 1998) (quoting United States v. Lochmondy, 890 F.2d 817, 822 (6th Cir. 1989)).  "Testimony is material only if there is a reasonable likelihood that it affected the judgment of the jury." Peoples v. Lafler, 734 F.3d 503, 516 (6th Cir. 2013) (citing Brooks v. Tennessee, 626 F.3d 878, 895 (6th Cir. 2010)).

Even assuming that Officer Emerick's incident report was correct and that her trial testimony was false, there is not a reasonable likelihood that her testimony about whom she interviewed during her investigation affected the jury's verdict.  Whether she spoke only with Scott Thies or whether she spoke with both Thies and another nurse was immaterial, because it was unrelated to the elements of the charged crimes.

Furthermore, " 'mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony,' " Coe, 161 F.3d at 343 (quoting Lochmondy, 890 F.2d at 822), and there is no reason to believe that Officer Emerick intentionally offered false testimony.  She may have been mistaken or negligent when she wrote her incident report and failed to mention the female nurse, who wanted to keep her identity confidential.

In conclusion, Petitioner has failed to show that the prosecutor knowingly relied on perjured testimony or allowed false testimony to go uncorrected.  As a result, Petitioner's trial attorney was not ineffective for failing to impeach Officer Emerick with her incident report, and appellate counsel was not ineffective for failing to raise the issue on direct appeal.  An attorney is not ineffective for failing to make a meritless argument.  Shaneburger v. Jones, 615 F.3d 448, 452 (6th Cir. 2010) (quoting Greer v. Mitchell, 264 F.3d 663, 676 (6th Cir. 2001)).

24

**F. Cause and Prejudice**

In his sixth and final claim, Petitioner alleges he has demonstrated "cause and prejudice" under Michigan Court Rule 6.508(D)(3) for not raising his fourth and fifth claims on direct appeal. Rule 6.508(D)(3) prohibits state courts from granting relief from judgment if a defendant could have raised his claims on appeal from his judgment or sentence unless the defendant shows cause for his failure to raise the claim on appeal and actual prejudice from the alleged irregularities.

The trial court, however, was the only state court to adjudicate habeas claims four and five in a reasoned decision, and it did not refer to Rule 6.508(D)(3) in its brief order denying Petitioner's motion for relief from judgment. Nor did the court say that it was rejecting Petitioner's fourth and fifth claims on the basis that he failed to raise those claims on appeal. Instead, the trial court addressed claims four and five on their merits.

Although the State's appellate courts subsequently cited Rule 6.508(D) as a basis for denying leave to appeal, their brief references to the rule are ambiguous as to whether they refer to a procedural default or to the denial of relief on the merits. Guilmette v. Howes, 624 F.3d 286, 289-92 (6th Cir. 2010). Thus, it cannot be said that the state courts relied on the cause-and-prejudice language of Rule 6.508(D)(3) to deny relief. And because this Court has not treated claims four and five as procedurally defaulted, Petitioner is not required to show cause for the failure to raise claims four and five on direct appeal or prejudice from the alleged constitutional errors. Cf. Coleman v. Thompson, 501 U.S. 722, 750 (1991) (holding that, "[i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is

25

barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice").

Furthermore, for the reasons given above, claims four and five have no substantive merit.  Therefore, to the extent Petitioner is re-asserting that the prosecutor violated his right to counsel of choice and allowed false testimony to go uncorrected, he is not entitled to habeas relief.

## IV.  CONCLUSION

The state court decisions in this case were not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, nor an unreasonable determination of the facts.  Consequently, the petition for a writ of habeas corpus [dkt. #1] is **DENIED**.

## V.  CERTIFICATE OF APPEALABILITY

Petitioner may not appeal this decision unless a district or circuit judge issues a certificate of appealability.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)).  When, as here, "a district court has rejected the constitutional claims on the

merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack, 529 U.S. at 484.

Reasonable jurists could debate the Court's assessment of Petitioner's first claim regarding trial counsel's failure to move for a change of venue and Petitioner's second claim regarding the sufficiency of the evidence.  The Court therefore grants a certificate of appealability on those claims and leave to proceed in forma pauperis on appeal.  The Court declines to grant a certificate of appealability on Petitioner's remaining claims because those issues are not adequate to deserve encouragement to proceed further.


                                        s/Marianne O. Battani
                                        MARIANNE O. BATTANI
                                        UNITED STATES DISTRICT JUDGE
Dated: February 5, 2014


CERTIFICATE OF SERVICE


I hereby certify that on the above date a copy of this Order was served upon the Petitioner via ordinary U.S. Mail, and Counsel for the Respondent, electronically.

                                        s/Bernadette M. Thebolt
                                        Case Manager


27